**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| BENJAMIN MILLER,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SEYMOUR, INDIANA; MATT NICHOLSON, in his individual capacity; GREG O'BRIEN, in his individual capacity; JOHN WATSON, in his individual capacity; C.J. FOSTER, in his individual capacity; MICHAEL PAYNE, in his individual capacity; DAVE EARLEY, in his individual capacity; BRAD LUCAS, in his individual capacity; and JOHN DOES 1-10,<br><br>Defendants. | Case No. 4:26-cv-00193-TWP-KMB<br><br>Hon. Tanya Walton Pratt, Judge<br>Hon. Kellie M. Barr, Magistrate Judge |

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES, AND DEMAND FOR JURY TRIAL**

Plaintiff Benjamin Miller, by counsel, files this First Amended Complaint as a matter of course under Fed. R. Civ. P. 15(a)(1)(B), within 21 days after service of Defendants' Motion to Dismiss (Dkt. 16). As required by S.D. Ind. L.R. 15-1(b), this First Amended Complaint reproduces the entire pleading as amended and supersedes the original Complaint (Dkt. 1). Miller alleges as follows:

## INTRODUCTION

1. This action seeks to vindicate the constitutional rights of Benjamin Miller, a former Sergeant with the Seymour Police Department ("SPD"). For years Miller reported misconduct by SPD officers and command staff, and he did not keep those reports inside the Department. He took them to the Indiana State Police, the Jackson County Prosecutor, the

Indiana State Excise Police, the Office of the Indiana Attorney General, elected officials and candidates for office, and counsel in a federal civil rights case against the City. SPD's leadership knew it and said so.

2. After Miller reported a July 2024 incident in which Det. Michael Payne grabbed a fellow officer, the investigation was turned on Miller and handed to Lt. C.J. Foster, an officer Miller had reported to the State Police. Miller was ordered not to speak to anyone about it. On November 14, 2024, the Board of Public Works and Safety voted to dismiss him after a closed executive session and a meeting with Assistant Chief John Watson, without notice to Miller and before he had any chance to respond. The City then cut off his pay, let the hearing it had set fall through, canceled the rescheduled hearing, and never set another.

3. Miller resigned on March 10, 2025, under a written agreement in which the City promised that the Chief would not engage in verbal communications with prospective employers about Miller and would instruct his staff not to disparage him. Within days, the Chief and Assistant Chief briefed a Columbus Police Department background investigator in person, and Columbus withdrew Miller from its hiring process on March 27, 2025. SPD's accusation of "dishonesty" then reached the Jackson County Prosecutor, who passed a *Brady*/*Giglio* warning to Lawrence County, ending a second job opportunity.

4. Miller brings claims under 42 U.S.C. § 1983 for First Amendment retaliation (Count I), deprivation of property and liberty without due process of law (Count II), and municipal liability against the City of Seymour (Count III). He seeks compensatory damages, punitive damages against the individual Defendants, reinstatement and other equitable relief, and attorney fees under 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

6. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Jackson County, Indiana, and Defendants reside or conduct business there.

## PARTIES

7. Plaintiff Benjamin Miller is a resident of Jackson County, Indiana. He served as a police officer with SPD from 2014 until his coerced resignation under the Settlement and Resignation Agreement signed March 10, 2025, and held the rank of Sergeant.

8. Defendant City of Seymour, Indiana (the "City") is a municipal corporation and political subdivision of the State of Indiana. It operates SPD and, through its Board of Public Works and Safety (the "Board"), holds final authority over the discipline and dismissal of SPD officers. Ind. Code § 36-8-3-4.

9. Defendant Matt Nicholson is the Mayor of Seymour and a member of the Board. He is sued in his individual capacity.

10. Defendant Greg O'Brien is the Chief of Police of SPD. He is sued in his individual capacity.

11. Defendant John Watson is the Assistant Chief of Police of SPD. He is sued in his individual capacity.

12. Defendant C.J. Foster is a Lieutenant with SPD and, at relevant times, was President of Fraternal Order of Police Lodge #108 ("FOP"). He is sued in his individual capacity.

13. Defendant Michael Payne is a Detective with SPD. He is sued in his individual capacity.

14. Defendant Dave Earley is a member of the Board. He is sued in his individual capacity.

15. Defendant Brad Lucas is a member of the Board. He is sued in his individual capacity.

16. Defendants John Does 1-10 are SPD or City personnel, presently unknown, who participated in the violations alleged here. Miller will seek leave to name them when their identities are learned in discovery.

17. At all relevant times, each individual Defendant acted under color of state law.

## FACTUAL ALLEGATIONS

### A. Miller's service

18. Miller joined SPD in 2014 and rose to the rank of Sergeant. Before the events described below, he had no sustained discipline.

19. Miller was a merit officer who could be disciplined or dismissed only for cause and only after the notice and hearing procedures in Ind. Code § 36-8-3-4. He therefore had a protected property interest in his continued employment.

### B. Miller's speech outside the Department

20. Over a period of years, Miller reported misconduct by SPD officers and command staff to people and agencies outside SPD's chain of command. Reporting to those outside

agencies was not part of Miller's job duties as a patrol officer or sergeant. He did so as a citizen, and the subjects of his reports, including crimes and official misconduct by public employees, are matters of public concern.

21. Abbott/Lamb prosecution. Indiana State Police ("ISP") Detectives Roger Drew and Andrew Mitchell interviewed Miller at the INDOT building on Depot Drive in Seymour as part of their criminal investigation of former SPD Chief William Abbott and Captain Carl Lamb for ghost employment and official misconduct, which resulted in criminal charges filed in February 2020 in Cause No. 36C01-2002-F6-000086. Miller gave the State Police information about the conduct he had reported. Miller later learned that Watson had worked for Lamb's private training business while employed by SPD; Watson was neither charged nor disciplined.

22. Battery on Natasha Miller. On New Year's Eve 2016, at a social gathering at Payne's home, an off-duty and intoxicated Det. Payne grabbed and twisted the breast of Miller's wife, Natasha Miller, leaving a bruise. Miller reported it to Watson at the time. When SPD did nothing, Miller reported the battery to ISP during his interview with Detectives Drew and Mitchell, followed up by telephone with Det. Drew, and later reported it to Jackson County Prosecutor Jeff Chalfant, who told Miller too much time had passed. Miller made these reports as the husband of the victim. Payne's hostility toward Miller dates from that report.

23. FOP alcohol sales. In connection with the SPD Christmas party in December 2023, Lt. Foster, then FOP President, sought to resell alcohol that the FOP had bought at cost for the party and took reimbursement for alcohol that officers had taken home. Miller gave Chief O'Brien Foster's Department email describing the plan and told O'Brien it was illegal; O'Brien replied that Foster "was not very smart." Miller's complaint later reached ISP Det. Drew through

Jennings County Det. Ian McPherson, and an ISP detective then called Miller and took his report by telephone.

24. FOP finances. On April 23, 2020, Foster sent a department-wide email inviting officers to use the FOP's tax-exempt Sam's Club account for personal purchases. Miller raised the personal, tax-free use of that account at an FOP meeting, where Foster said he often used the card that way. As FOP Vice President, Miller also raised the FOP's failure to provide financial statements and its handling of funds with his state FOP representative and, on that representative's advice, spoke with a member of the Indiana State Board of Accounts. The FOP is a private fraternal organization, and none of this speech was part of Miller's police duties.

25. Excise Police. Officer Crystal Schapson worked at the Vat and Barrel, a Seymour restaurant and bar, including while on medical leave from SPD, and served alcohol there illegally. In late 2023 and early 2024, during his interview process for a position with the Indiana State Excise Police, Miller reported Schapson's illegal service of alcohol to Excise officer Ashley Tate. Miller also discussed it with Prosecutor Chalfant.

26. Office of the Attorney General and state legislators. Beginning in or around June 2024, Miller spoke on multiple occasions with Blake Lanning, Chief Deputy in the Office of the Indiana Attorney General, about SPD's failure to arrest drivers who had never been licensed and Chief O'Brien's public statements to the contrary. On June 15, 2024, at the state delegate convention in Indianapolis, Miller discussed the same subject with State Representative Jim Lucas, who is not related to Defendant Brad Lucas.

27. *Shoenthal v. City of Seymour*. In *Shoenthal v. City of Seymour*, No. 4:21-cv-00079-TWP-KMB (S.D. Ind. filed May 11, 2021), a federal civil rights case against the City, Miller spoke by telephone with the plaintiff's counsel, Benjamin Ellis. Miller's statement was

not given under oath. Miller told plaintiff's counsel that Officer Kayla Griffin had not passed SPD's standard hiring physical and that Watson had instead given her a "private" physical. That account contradicted the position of O'Brien and Watson that Griffin had passed the physical. Miller was not called to testify.

28. Elected officials and candidates. Miller discussed SPD's problems with Dan Robison, a candidate for Mayor of Seymour against Defendant Nicholson, during ride-alongs and otherwise. Miller also publicly and financially supported Robison's campaign against Nicholson; Robison's campaign finance reports filed in January and April 2023 list Miller as a contributor. Miller discussed Captain Troy Munson's drinking and attendance with then-City Councilman Drew Storey during ride-alongs.

**C. SPD learned of Miller's outside speech and resented it**

29. SPD's leadership knew about Miller's outside reports. On multiple occasions, O'Brien accused Miller of "turning the administration in" to the State Police.

30. Det. Drew told SPD administration that Miller had reported SPD personnel to ISP.

31. The administration also knew of, and resented, Miller's report about Foster's alcohol sales. In or around December 2024, after Miller had been placed on leave, Watson told Sgt. Brian Moore that the Department's 2024 Christmas party would be "BYOB" because Foster and the FOP would not be buying the alcohol, since Miller had turned them in. Although the remark postdates the actions described in Sections D and E, it confirms that SPD command staff knew of Miller's report and held it against him.

32. The administration learned that Miller had reported Schapson to the Excise Police and told Schapson, who repeated it to SPD dispatchers, including Alyshea Dugan.

33. In the early stages of the *Shoenthal* case, O'Brien and Watson called Miller into a meeting, nominally about a conversation Miller had with another officer, and used it to find out what Miller knew about the case. O'Brien and Watson also tried to convince Miller that Griffin had passed the physical, and the meeting turned into an argument.

34. While Robison was a candidate for Mayor, Robison saw Schapson carry alcohol to her marked patrol car and asked Miller whether that was allowed. O'Brien then called Robison into his office and disparaged Miller. Captain Munson went to Councilman Storey and told him to tell Robison to stay away from Miller because Miller was "a cancer." Storey told both Robison and Miller. On information and belief, Nicholson likewise told others that Miller was "a cancer" and needed to go.

35. In or around July 2024, before the incident described below, Munson told Schapson that the Department intended to "get rid of Miller."

**D. The Payne/Bryan incident and the investigation turned on Miller**

36. On July 17, 2024, during SWAT training, Det. Payne grabbed Cpl. Stuart Bryan's upper arm in a rude and insolent manner. As Bryan's supervisor, Miller reported the incident to Lt. Brandon White and gathered witness statements. SPD opened an internal investigation, IA-24-002, nominally into Payne's conduct.

37. On or about August 12, 2024, Payne, whom Miller had reported for the battery on Miller's wife, submitted a written complaint to O'Brien and Watson attacking Miller's handling of the Bryan report. On information and belief, Payne's complaint was used to turn the investigation on Miller.

38. The focus quickly shifted to Miller. During Miller's August 21, 2024 interview, Lt. Foster, one of the officers Miller had reported to ISP, entered the room and ordered: "I'm

ordering you do not discuss this with nobody. Period. Not Stu, not your guys, not nothing. If you do. It's just more trouble for you." At that interview, Miller was not told he was the subject of the investigation until roughly twenty minutes in and was not given a statement of rights.

39. On October 2, 2024, O'Brien placed Miller on paid administrative leave and opened IA-24-003 into Miller's conduct, assigning Foster to oversee it. October 2, 2024 was the last day Miller worked for SPD. That same day, Watson told Miller that Foster's order not to speak with anyone was not Department policy and should not have been given. On October 8, 2024, Foster interviewed Miller in IA-24-003; Miller was again given no statement of rights, and Miller's request for a copy of Payne's complaint letter was denied, with Foster claiming he did not have it.

40. The investigation of Miller was one-sided. Witness statements were coached, exculpatory material was withheld, Miller's notes were recast as false reports, and Watson refused to provide interview recordings and narratives to Miller's counsel. The investigation produced findings of "dishonesty" and "untruthfulness" that are false.

41. The Civilian Complaint Review Board that reviewed the investigation issued findings dated October 31, 2024. It was not properly constituted or oriented, and Miller had no opportunity to appear before it in IA-24-003. On information and belief, O'Brien personally delivered the IA-24-003 investigation packet to a member of the review board, Jerry Hackney, at Hackney's home and spent more than an hour there discussing the investigation. On information and belief, and contrary to the reason given for Miller's October 2, 2024 leave, the review board had not requested further review of Miller's conduct.

**E. The Board dismisses Miller without notice or a hearing**

42. On November 14, 2024, the Board met in a closed executive session for a "job performance evaluation of an individual employee." Miller and his counsel were not notified.

43. At the public Board meeting that immediately followed, Earley said, "Well having met with Officer John Watkins [sic] … and hearing and we've had several days to … upon the recommendation of the complaint review board I'll make a motion to dismiss the officer in question." Nicholson referred to reading the file "beforehand" and told the City Attorney, "I'll leave it to you to do what you need to do legally." The Board, with Nicholson, Earley, and Lucas voting, dismissed Miller 3-0. The minutes record that "Mr. Earley made a motion to dismiss the employee in question from the Executive Session" and that the motion "passed 3-0."

44. Miller learned of his dismissal by watching the Board's video. The Board later sent him a Findings and Notice of Dismissal, which he received by certified mail on November 21, 2024. Those Findings recast Foster's gag order as a limited order with exceptions for family, counsel, and clergy, which it was not.

45. Before the vote, Miller received no notice of the charges before the Board, no explanation of the evidence, and no opportunity to respond. The Board had already met privately with the Assistant Chief and reviewed the file for several days.

46. Miller requested a hearing and discovery on November 19, 2024.

47. On November 27, 2024, after Miller requested a hearing, the Board voted to stop his pay and place him on unpaid administrative leave effective at the end of the pay period on November 30, 2024, pending a hearing. Miller's last paycheck covered the period through November 30, 2024. Whether the Board's November 14 vote is treated as a completed dismissal or as a dismissal later converted into unpaid leave pending a hearing, the result was the same:

Miller was removed from his position on November 14, 2024 without notice or an opportunity to respond, and from November 30, 2024 forward he was deprived of his pay without having been heard.

48. A hearing was set for January 9, 2025, but it did not go forward. At the Board's January 9, 2025 meeting, the hearing was reset for after the Board's January 23, 2025 meeting. The City retained outside counsel, Beth Copeland. After Miller's counsel raised the November 14 procedure with her, Copeland canceled the hearing. Copeland raised alternative forums, such as a retired judge or another city's board, but only if Miller gave up his objections to the Board's earlier procedural errors. No hearing was ever held, and no new date was offered before Miller resigned.

49. The Indiana General Assembly has spelled out the process owed to an officer under investigation, including a copy of the complaint or notice of its nature, and the right to be represented by an attorney during an interview that relates to the officer's continued fitness for law enforcement service. Ind. Code § 36-8-2.1-5(b)(5), (b)(11). Miller's August 21, 2024 and October 8, 2024 interviews related to his continued fitness for law enforcement service, as shown by Defendants' use of those interviews to remove him from duty. Defendants did not provide Miller a copy of the complaint or notice of its nature before either interview, and did not allow him to be represented by an attorney during the August 21, 2024 interview. Miller relies on that statute as evidence of the process he was due, not as a separate claim.

### F. The coerced resignation

50. By early 2025, Miller had been without pay since November 30, 2024, was paying his health insurance premiums himself, and had no hearing date. Before Miller signed the Agreement described below, Jennings County Det. Garrett Hoppock, Jennings County Det. Ian

McPherson, and Jefferson County Deputy Devlin McMindes each told Miller that SPD was seeking, or had discussed seeking, criminal charges against him. Miller was also aware that SPD's "dishonesty" findings could be used to place him on a *Brady*/*Giglio* list.

51. The City's outside counsel proposed that Miller resign in exchange for dismissal of the disciplinary charges. The City, through its counsel, then negotiated a Settlement and Resignation Agreement (the "Agreement") with Miller's counsel. The Agreement provides that the Chief "will not engage in any verbal communications or requests made by future or possible employers concerning Miller's employment" (¶ 11.2), that SPD will give only a neutral statement (¶ 11), and that "[t]he Chief agrees and shall instruct his command staff and members of the Department to not defame or otherwise disparage Miller" (¶ 12). (Dkt. 17-1.)

52. On March 10, 2025, after receiving a verbal conditional offer of employment from the Columbus Police Department, Miller signed the Agreement. He signed because of the City's promises in the Agreement; because the City had canceled his hearing and left him without pay; because he feared, based on what he had been told, that SPD would pursue criminal charges against him and seek to have him placed on a *Brady*/*Giglio* list; and because he believed the Agreement would allow him to continue his law-enforcement career.

53. The Agreement contains no release of Miller's constitutional or civil rights claims.

54. Defendants did not keep those promises, and on information and belief never intended to keep them. On information and belief, O'Brien never instructed his staff not to disparage Miller, and SPD personnel continued to talk about Miller and his departure after he signed.

## G. Columbus Police Department

55. Miller had completed Columbus PD's physical, written exam, and panel interview. On March 10, 2025, he met with Columbus background investigator Det. Casey Kendrick, received a verbal conditional offer, and began the polygraph scheduling process. Columbus emailed a written conditional offer on March 11, 2025, and on March 13, 2025 scheduled the polygraph for March 19, 2025.

56. After Columbus began its background investigation, and before March 27, 2025, O'Brien and Watson met in person with Det. Kendrick about Miller. In a follow-up interview at Miller's home in mid-March 2025, Kendrick told Miller about that meeting and focused on a claim that Miller's last shift at SPD was December 30, which was false; Miller had not worked since October 2, 2024.

57. Kendrick told Miller to have a back-up plan and canceled the polygraph. By letter dated March 27, 2025, Columbus informed Miller that he "will not continue in the current hiring process as a result of information gathered during your background investigation."

58. O'Brien's and Watson's in-person briefing of Columbus went beyond any disclosure of written records permitted by Ind. Code § 36-8-2-2 and by Agreement ¶ 10.2, and it directly contradicted Agreement ¶ 11.2.

## H. Lawrence County and the *Brady*/*Giglio* accusation

59. Before signing, Miller confirmed with Prosecutor Chalfant that Chalfant had no concern, and Chalfant told Miller to use him as a reference. Miller did so when he applied to the Lawrence County Sheriff's Office, whose Chief Deputy, Brandon Blackwell, made him a verbal offer of employment.

60. On information and belief, SPD administration told Chalfant that there was a "facts and findings" letter of dishonesty against Miller. Chalfant later said he had been told this.

61. On March 31, 2025, Miller's counsel spoke with Chalfant, who said he had taken no action regarding Miller's ability to testify.

62. On April 25, 2025, Chief Deputy Blackwell wrote to Miller that "the Jackson County Prosecutor called our Prosecutor, explaining that there is/was a potential that you would be deemed an uncredible witness in court proceedings basically saying you would be on the Giglio List," and that this was "a cause for concern for us."

63. Miller's counsel sent the Lawrence County Sheriff's Office a letter dated May 19, 2025 (updated May 20, 2025) explaining that no prosecutor had received any substantiated finding of dishonesty. The Sheriff's Office never extended a formal offer and stopped responding to Miller.

64. Miller has not been able to obtain employment in law enforcement since his resignation. He has been dropped from the hiring processes of other agencies, including the Monroe County Sheriff's Department, Bartholomew County, the City of Bedford, Greene County, Indiana University, Mitchell Police Department, Jennings County, and Scott County.

**I. Damages**

65. As a direct result of Defendants' conduct, Miller lost his position, pay, and benefits; lost the Columbus and Lawrence County positions; has been effectively barred from his profession; and has suffered reputational harm, emotional distress, and humiliation.

66. The individual Defendants acted intentionally and with reckless indifference to Miller's federally protected rights.

**COUNT I**
**First Amendment Retaliation**
**(42 U.S.C. § 1983 – Against Defendants Nicholson, O'Brien, Watson, Foster, Payne, and John Does 1-10)**

67. Miller incorporates paragraphs 1 through 66 of this First Amended Complaint as if fully set forth here.

68. Miller's reports to ISP, the Jackson County Prosecutor, the Excise Police, the Office of the Attorney General, and a state legislator; his statement to counsel in *Shoenthal*; his speech about FOP finances; and his political speech and support for Robison were made as a citizen and not pursuant to his official duties. Each addressed matters of public concern, including crimes and official misconduct by public employees. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Lane v. Franks*, 573 U.S. 228 (2014); *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785 (7th Cir. 2016). Miller's interest in that speech outweighed any interest of the City in workplace efficiency. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

69. The Count I Defendants took actions that would deter a person of ordinary firmness from speaking, including: Payne's complaint against Miller; turning the IA-24-002 investigation on Miller; assigning Foster, a subject of Miller's reports, to oversee the investigation of Miller; imposing Foster's blanket gag order; fabricating "dishonesty" and "untruthfulness" findings; dismissing him on November 14, 2024 without notice; placing him on unpaid leave; canceling his hearing; coercing his resignation; and briefing a prospective employer and the prosecutor against him.

70. Miller's protected speech was at least a motivating factor in those actions. The Count I Defendants knew of the speech and resented it, as shown by O'Brien's accusations that Miller turned the administration in to ISP; Det. Drew's disclosure to SPD administration; O'Brien's and Watson's confrontation of Miller during *Shoenthal*; the leak of the Excise report

to Schapson; O'Brien's disparagement of Miller to Robison and Munson's "cancer" remark; Munson's statement that the Department intended to "get rid of Miller"; Foster's assignment to investigate the officer who had reported him; and Watson's later "BYOB" remark, which confirms command staff's knowledge of and animus toward Miller's report about Foster.

71. The Count I Defendants' conduct violated Miller's clearly established First Amendment rights and caused the damages described above.

**COUNT II**
**Fourteenth Amendment Procedural Due Process**
**(42 U.S.C. § 1983 – Against Defendants Nicholson, O'Brien, Watson, Earley, Lucas, and John Does 1-10)**

72. Miller incorporates paragraphs 1 through 66 of this First Amended Complaint as if fully set forth here.

73. Miller had a protected property interest in his continued employment, because under Ind. Code § 36-8-3-4 he could be disciplined or dismissed only for cause after notice and a hearing.

74. Miller also had a protected liberty interest in pursuing his occupation. Defendants publicly made and disseminated false, stigmatizing charges of dishonesty and untruthfulness in connection with the loss of his employment, and those charges foreclosed his employment in law enforcement, including with Columbus PD and the Lawrence County Sheriff's Office.

75. Nicholson, Earley, and Lucas deprived Miller of his employment on November 14, 2024, and at a minimum of his pay effective November 30, 2024, without notice of the charges, an explanation of the evidence, or an opportunity to respond, after a closed session and ex parte contact with Watson, even though Miller had never been arrested or charged with any crime. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985); *cf. Gilbert v. Homar*, 520 U.S. 924, 933–34 (1997) (holding that suspending a public employee without pay absent a pre-

suspension hearing did not violate due process where the employee had been arrested and formally charged with a felony, which supplied independent grounds for the suspension).

76. Defendants then denied Miller any meaningful post-deprivation hearing or name-clearing hearing by letting the hearing set for January 9, 2025 fall through, canceling the rescheduled hearing, and conditioning any alternative forum on a waiver of his procedural objections, while he remained without pay.

77. Miller's March 10, 2025 resignation was not voluntary. It was induced by the City's material misrepresentations that the Chief would not engage in verbal communications with prospective employers about Miller and would instruct his staff not to disparage him, promises that Defendants did not intend to keep and broke within days, and by the City's cancellation of his hearing while he went without pay. A resignation induced by material misrepresentation is a deprivation of property requiring due process. *Spreen v. Brey*, 961 F.2d 109, 112–13 (7th Cir. 1992); *Ulrey v. Reichhart*, 941 F.3d 255, 261–63 (7th Cir. 2019); *Martin v. Goldsmith*, 163 F.4th 1046, 1059–61 (7th Cir. 2025), *petition for cert. filed sub nom. Harrington v. Martin*, No. 25-1348 (U.S. June 1, 2026).

78. The process Miller received fell far short of what the Constitution requires, and short of the protections that Indiana itself prescribes for officers in Ind. Code §§ 36-8-2.1-5 and 36-8-3-4.

79. Defendants' conduct violated Miller's clearly established rights and caused the damages described above.

**COUNT III**
**Municipal Liability**
**(42 U.S.C. § 1983 – Against the City of Seymour)**

80. Miller incorporates paragraphs 1 through 79 of this First Amended Complaint as if fully set forth here.

81. Under Ind. Code § 36-8-3-4, the Board has final policymaking authority over the discipline and dismissal of SPD officers. The Board's November 14, 2024 decision to dismiss Miller without notice or a hearing, its November 27, 2024 decision to place him on unpaid leave, and the City's cancellation of his hearing are decisions of the City's final policymaker and are the City's official policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

82. Those decisions were the moving force behind the violations of Miller's rights under the First and Fourteenth Amendments alleged in Counts I and II.

83. In addition, and in the alternative, the City maintained a widespread custom, known to and tolerated by its policymakers, of protecting favored officers from accountability for misconduct and retaliating against officers who reported it. That custom is shown by, among other things, SPD's inaction on Miller's reports described above and O'Brien's intervention in a domestic-violence report involving an SPD officer, for which Miller had given the complaining spouse an ISP detective's contact information, and O'Brien's blaming of Miller for that report.

84. The City is liable for Miller's resulting damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Benjamin Miller requests judgment in his favor and against Defendants, and that the Court award:

a. Compensatory damages against all Defendants in an amount to be determined at trial, including lost wages and benefits, lost earning capacity, emotional distress, and reputational harm;

b. Punitive damages against the individual Defendants;

c. Equitable relief against the City, including reinstatement to the rank of Sergeant with full seniority, back pay, benefits, and pension contributions, or front pay in lieu of reinstatement, and a name-clearing hearing;

d. A declaration that Defendants violated Miller's rights under the First and Fourteenth Amendments and that the March 10, 2025 Agreement does not bar these claims;

e. Reasonable attorney fees and costs under 42 U.S.C. § 1988;

f. Pre-judgment and post-judgment interest; and

g. All other just and proper relief.

**JURY DEMAND**

Under Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: October 19, 2026

Respectfully submitted,

/s/ Zachary B. Miller
Zachary B. Miller, Atty. No. 26883-49
MILLER LAW, LLC
P.O. Box 288
405 N. Main Street, Suite D
Brownstown, IN 47220
Telephone: 812-525-0830
zach@zmillerlaw.com
*Counsel for Plaintiff Benjamin Miller*

**CERTIFICATE OF SERVICE**

I certify that on October 19, 2026, I electronically filed the foregoing First Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notice of this filing to the following counsel of record:

Justin M. Schaefer
Patrick A. Muldoon
BARNES MALONEY PLLC
401 West Main Street, Suite 1600
Louisville, KY 40202
jschaefer@sbmkylaw.com
pmuldoon@sbmkylaw.com
*Counsel for Defendants*

/s/ Zachary B. Miller
Zachary B. Miller